STATE, TRENTON AND NEW BRUNSWICK TURNPIKE COMPANY ET AL., PROSECUTORS, v. AMERICAN AND EUROPEAN COMMERCIAL NEWS COMPANY.

1. The supplement of 1880 to the act in relation to telegraph companies, authorizing the condemnation of the right of way, is constitutional. The use contemplated by the supplement is a public, and not a private use.
2. Companies, in accepting the benefits of this law, lay themselves under obligation to the public to permit the use of their lines by all persons, under reasonable regulations.
3. This obligation upon a company need not be imposed in express words; it may rest upon implication.
4. The petition to condemn the right of way over a turnpike should state that the telegraph company is to be limited in its right to erect poles to a space of specified width along the exterior lines of the pike, and the order should be equally definite.

On *certiorari* to review appointment of commissioners under the supplement of 1880 to the act relative to telegraph companies.

Argued at February Term, 1881, before Justices VAN SYCKEL and MAGIE.

For the plaintiff, *E. T. Green.*

For the defendant, *G. R. Lindsay.*

The opinion of the court was delivered by

VAN SYCKEL, J. The prosecutor has certified into this court, for review, the appointment of commissioners to assess the damages which it will sustain by reason of the erection of the telegraph line of the defendant upon such portion of the turnpike of the prosecutor as lies within the county of Mercer.

On this *certiorari* this court has power to pass upon all questions which affect the right of the defendant company to take the plaintiff's lands, so far as they will show that, as to the plaintiff, no such authority exists. *State* v. *Hudson Tunnel Co.,* 9 *Vroom* 548.

The first objection which will be considered is radical : the prosecutor challenges the right of the defendant to invoke the power of eminent domain.

The defendant is a corporation of this state, organized under and in pursuance of the act entitled "An act to incorporate and regulate telegraph companies." *Rev., p.* 1174.

The eighth section of that act requires the consent of the land-owner to the use of his lands by the company.

In 1880 a supplement was passed authorizing the appointment of commissioners to condemn the right of way. *Pamph. L.* 1880, *p.* 201, § 2.

This section is alleged to be unconstitutional and void, because it is an attempt to take private property and devote it to a private use.

What constitutes a public use has been the subject of much discussion.

Mr. Mills, in his work on Eminent Domain, says : " The true criterion by which to judge of the character of the use is

whether the public may enjoy it by right, or only by permission." *Mills*, § 14.

In England, and in most of the states in this country, the duty to transmit messages is expressly laid upon telegraph companies by statute.

It has not been established as a rule, however, that, in order to render the use public, and to authorize the legislature to bestow the power to take private property, the duty must be expressly imposed upon a company to serve all who make reasonable demands upon it.

In *Lumbard* v. *Stearns*, 4 *Cush.* 60, Chief Justice Shaw held that an act of the legislature incorporating a company for the purpose of supplying a village with pure water, with authority to condemn the necessary lands and springs, was constitutional, although it contained no express provision requiring the corporation to supply, on reasonable terms, all persons applying for water. By accepting the act of incorporation, the company undertook to do all the public duties required of it; and a refusal to supply any reasonable demand would be such a misfeasance as would subject it to indictment, or such an abuse of its franchise as would render it amenable to proceedings for the revocation of its charter.

The like view was entertained by one of the most eminent jurists this state has produced.

In *Scudder* v. *Trenton Delaware Falls Co.*, *Saxt.* 694, 729, where the charter imposed no restraint upon the water company to supply power upon a reasonable demand, this learned judge says: " I do not know that this court can establish a general rule that shall hold good in all cases, and be a permanent bar to legislative encroachment. The ever-varying condition of society is constantly presenting new objects of public importance and utility ; and what shall be considered a public use or benefit may depend somewhat on the situation and wants of the community for the time being. The great principle remains. There must be a public use or benefit—that is indisputable ; but what that shall consist of, or how extensive it shall be to authorize an appropriation of private property,

is not easily reducible to a general rule. Looking at the case in all its bearings, and believing as I do that great benefit will result to the community from the contemplated improvement, I am not satisfied to declare the act of incorporation, or that part of it which is now in question, void and unconstitutional. I do not see in it such a decided and palpable violation of constitutional right as will warrant me to put an end to this work by the strong arm of the court. The legislature have thought proper, in their wisdom, to exercise the right of eminent domain for an object which they deem of public use and importance; and although their judgment is not conclusive as to the right, it is certainly entitled to a most respectful consideration."

"The term 'public use' is flexible, and cannot be confined to public use known at the time of framing the constitution. All improvements that may be made, if useful to the public, may be encouraged by the exercise of eminent domain. Any use of anything which will satisfy a reasonable public demand for facilities of travel, for transmission of intelligence or of commodities, would be a public use." *Mills*, § 21 ; *Concord R. R.* v. *Greely*, 17 *N. H.* 47 ; *New Orleans Tel.* v. *Southern Tel.*, 53 *Ala.* 211.

In this case I think the legislature has sufficiently indicated its intention to give telegraph companies a public character, and to impose upon them the duty to transmit all messages which may be offered.

Section 6 of the act in question provides that "any line of telegraph or company organized and worked by virtue of this act, shall establish, maintain and keep open at least one office every forty miles traversed by their line." '

Section 4 limits the price which may be charged for messages, and section 12, after prohibiting the disclosure of the contents of any message, enacts that "all dispatches which may be filed at any office in this state for transmission to any point, shall be so transmitted without being made public."

The word "filed" might be construed to mean only such messages as the company chose to accept and file for trans-

mission. In its strict sense, it would not include even messages received and sent at once before filing; but that would be a narrow interpretation of the clause, and render its evasion so easy that it would be almost nugatory.

It is more reasonable to hold that it signifies all messages which may be left for transmission, imposing a duty commensurate with the privileges granted.

These provisions of the law, in connection with the fact that the legislature has granted the right to take private property, clearly evince a legislative intent to lay such companies under an obligation to the public to permit the use of their lines by all persons, under reasonable regulations; and in accepting the benefits of this law, the recipient of them assumes the performance of this duty to the public.

This will admittedly constitute a public use authorizing the exercise of the right of eminent domain.

The telegraph has become as essential to the transaction of the business of the country as the railroads; and although telegraph companies are not, like railroads, chargeable with the duties of common carriers, yet, in the absence of the provisions which have been cited, the implication would be very strong that the legislature, in bestowing the franchise, intended to charge the companies with a duty to the public.

In the second place it is urged that this is an attempt to take the franchise heretofore granted to the prosecutor, which cannot be done without express authority in the statute. That a telegraph company might erect so many lines of poles, or place the poles in such a position at various points on the turnpike road, as to virtually appropriate the entire road-bed to this use, is true; but that is not the necessary result of the erection of a telegraph line.

The poles might be placed in such position near the exterior lines of the roadway that it would in nowise seriously impair the prosecutor's rights. The exercise of such a right, like the right of one railroad company to cross the track of another, requires no express grant of authority; it may be sustained

under the general grant of power to construct the lines. *Morris and Essex R. R. Co.* v. *Central R. R. Co.*, 2 *Vroom* 205.

The petition should therefore show that the telegraph company is to be limited in its right to erect poles to a space of a specified width along the exterior line or lines of the pike, that it may appear that it is not proposed to appropriate the franchise of the turnpike company; and the order should be equally definite.

On application for the appointment of commissioners to assess the value of lands taken by a company for a road, it is necessary, upon established principles of law, independent of requirement in the charter, that the land-owner should be distinctly apprised of the location and quantity of land to be valued, and that the appointment should specify the same. *Vail* v. *Morris and Essex R. R. Co.*, 1 *Zab.* 189; *Coster* v. *N. J. R. R. Co*, 4 *Zab.* 730.

The petition in this case is " for permission to plant telegraph poles on the margin of said turnpike road, in such places along the line of said turnpike road as not to interfere with the public travel of said road."

When and how and by whom will it be determined how far from the margin the poles may be set without such interference?

From this description no one could say with any accuracy how far from the exterior lines of the highway the poles might be placed. The telegraph company should be restricted to a certain, definite space, so that the commissioners can act intelligently in making their assessment.

There is another objection to the regularity of these proceedings.

The first rule to show cause was returnable April 5th, 1880.

This was served on the president of the Trenton and New Brunswick Turnpike Company, who is resident in Mercer county, but was not served on the Pennsylvania Railroad Company.

Subsequently a new rule to show cause was granted, returnable on the 19th of April, 1880.

This rule was served on the Pennsylvania Railroad Company, as directed by the order of publication, but was not served on the turnpike company.

So far as the case shows, nothing was done on the 5th of April. There was no adjournment of the hearing until the Pennsylvania Railroad Company was duly served with notice. The order appointing commissioners was made on the 19th of April, without any proof of notice to the turnpike company that application for such appointment would be made on that day.

The proceedings should therefore be set aside, with costs.